CLERK'S OFFICE
A TRUE COPY
May 09, 2024
s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Tracking of )
*(Identify the person, property, or object to be tracked)* )
)
a white 2019 Sierra Pickup bearing Wisconsin license ) Case No. 24-M-401 (SCD)
plate TK2745, vehicle identification number (VIN) )
3GTU9FED5KG204023 ) Matter No.: 2023R00366
)

## TRACKING WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government shows there is reason to believe that the person, property, or object described above has been involved in and likely will continue to be involved in the criminal activity identified in the application, and ✓ is located in this district;     is not now located in this district, but will be at execution;     the activity in this district relates to domestic or international terrorism;     other:                                                         .

I find that the affidavit(s), and any recorded testimony, establish probable cause to believe that
*(check the appropriate box)*     using the object     ✓ installing and using a tracking device
to monitor the location of the person, property, or object will satisfy the purpose set out in Fed. R. Crim. P. 41(c) for issuing a warrant.

I find entry into the following vehicle or onto the following private property to be necessary without approval or knowledge of the owner, custodian, or user of the vehicle or property for installing, maintaining, and removing the tracking device: vehicle: a white 2019 Sierra Pickup bearing Wisconsin license plate TK2745,
VIN: 3GTU9FED5KG204023; and
private property: 2626 Maple Grove Avenue, Racine, Wisconsin 53404

**YOU ARE COMMANDED** to execute this warrant and begin using the object or installing the tracking device within ten days from the date of this order and may continue use for 45 days. The tracking may occur within this district or another district.  To install, maintain, or remove the device, you may enter *(check boxes as appropriate)*

    into the vehicle described above     ✓ onto the private property described above
    in the daytime only *(i.e., 6:00 a.m. to 10:00 p.m.)*. ✓ at any time of day or night because good cause has been established.

Within 10 calendar days after the use of the tracking device has ended, the officer executing this warrant must both return it to United States Magistrate Judge *(name)* Stephen C. Dries                        and — unless delayed notice is authorized below — serve a copy of the warrant on the person who, or whose property or object, was tracked.

I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property or object, will be tracked *(check the appropriate box)*     for ____ days *(not to exceed 30)*
    ✓ until, the facts justifying, the later specific date of    11/04/2024    .

Date and time issued:  5-9-24. 9:55 am                    *(signature)* Stephen C. Dries
                                                                                                *Judge's signature*

City and state:          Milwaukee, Wisconsin               Hon. Stephen C. Dries, U.S. Magistrate Judge
                                                                                               *Printed name and title*

Case No.

**Return of Tracking Warrant With Installation**

1. Date and time tracking device installed: _____

2. Dates and times tracking device maintained: _____

3. Date and time tracking device removed: _____

4. The tracking device was used from *(date and time)*: _____

   to *(date and time)*: _____.

**Return of Tracking Warrant Without Installation**

1. Date warrant executed: _____

2. The tracking information was obtained from *(date and time)*: _____

   to *(date and time)*: _____.

**Certification**

I declare under the penalty of perjury that this return is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

*Subscribed, sworn to, and returned before me this date:*

_____        Date:_____

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Tracking of
*(Identify the person to be tracked or describe the object or property to be used for tracking)*
a white 2019 Sierra Pickup bearing Wisconsin license plate TK2745, vehicle identification number (VIN) 3GTU9FED5KG204023

Case No. 24-M-401 (SCD)
Matter No.: 2023R00366

## APPLICATION FOR A TRACKING WARRANT

I, a federal law enforcement officer or attorney for the government, have reason to believe that the person, property, or object described above has been and likely will continue to be involved in one or more violations of __21__ U.S.C. § __846/841(a)(1)__. Therefore, in furtherance of a criminal investigation, I request authority to install and use a tracking device or use the tracking capabilities of the property or object described above to determine location. The application is based on the facts set forth on the attached sheet.

☑ The person, property, or object is located in this district.
☐ The person, property, or object is not now located in this district, but will be at the time of execution.
☐ The activity in this district relates to domestic or international terrorism.
☐ Other:

The tracking will likely reveal these bases for the warrant under Fed. R. Crim. P. 41(c): *(check one or more)*

☑ evidence of a crime;
☑ property designed for use, intended for use, or used in committing a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ a person to be arrested or a person who is unlawfully restrained.

☑ I further request, for purposes of installing, maintaining or removing the tracking device, authority to enter the following vehicle or private property, or both:
vehicle: a white 2019 Sierra Pickup bearing Wisconsin license plate TK2745, VIN: 3GTU9FED5KG204023
private property: 2626 Maple Grove Avenue, Racine, Wisconsin 53404

☑ Delayed notice of ____ days (give exact ending date if more than 30 days: __11/04/2024__) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*
Jacob Cowan, FBI Special Agent
*Applicant's printed name and title*

Sworn to before me **Telephonically**

Date: 5-9-24

*Judge's signature*
Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

City and state: Milwaukee, Wisconsin

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT
### Matter No.: 2023R00366

I, Jacob Cowan, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117 to authorize the installation and monitoring of a tracking device on a **white 2019 Sierra Pickup bearing Wisconsin license plate TK2745, vehicle identification number (VIN) 3GTU9FED5KG204023** (herein referred to as the "**Pickup**"). Based on the facts set forth in this affidavit, I believe that the **Pickup** is presently being used in furtherance of violations 21 U.S.C. §§ 841(a)(1), 846, and 843(b), and that there is probable cause to believe that the installation of a tracking device on the **Pickup** and use of the tracking device will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

2. I am I am a sworn federal law enforcement officer with the Federal Bureau of Investigation (FBI), with authority to investigate federal offenses pursuant to Titles 18, and 21 of the United States Code. I have been employed as a Special Agent with the FBI since June 2016. Prior to this, I served as an Officer in the United States Army for twelve years. I have obtained a Bachelor of Science Degree in Criminal Justice from the University of Wisconsin-Milwaukee, a Master's in Professional Studies (M.P.S.) from St. John's University, and a Post Graduate Certificate from the Kennedy School of Government at Harvard University. I graduated from the FBI Academy in Quantico, Virginia in 2016 and have over seven years of law enforcement experience. I have been involved in the enforcement and investigation of numerous violations of federal law to include drug trafficking investigations, firearm trafficking investigations, and

1

violent crime related cases. I have personally conducted and participated in numerous investigations that have given me familiarity with the various methods that criminals use to conduct illicit firearm and narcotics transactions in violation of federal law. I have used investigative techniques including, but not limited to: consensual monitoring, physical surveillance, witness and subject interviews, court authorized electronic surveillance, review and analysis of telephone records, and the execution of search and arrest warrants.

3. In addition to my experience in the investigation of individuals involved in federal criminal offenses, I also have knowledge and experience in the apprehension and prosecution of individuals involved in federal criminal offenses. I am familiar with and have experience in the use of devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of those devices and their locations.

4. As such, I am "an investigator or officer charged by the Attorney General with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of the laws of the United States," within the meaning of Section 3051(a) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, execute warrants and to make arrests for offenses against the United States and offenses enumerated in United States Code Title 18 and Title 21.

5. Based upon my training and experience, I know that a significant percentage of controlled substances, specifically marijuana, cocaine, heroin, fentanyl, and methamphetamines, are delivered to individuals using vehicles by drug traffickers.

6. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

7. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846 have been committed, are being committed, or will be committed by ARMANDO HURTADO (DOB: 08/27/1982), and other unknown persons.

## PROBABLE CAUSE

### February 28, 2024, Controlled Narcotics Purchase from HURTADO

8. The Federal Bureau of Investigation (FBI) is investigating allegations that members of the Latin Kings street gang, including HURTADO, are conspiring with each other, and other individuals yet unknown, to transport and distribute controlled substances, namely cocaine and fentanyl in Racine, WI. The investigation has revealed that HURTADO is believed to reside in Racine, WI and that he has used the **Pickup** in furtherance of drug-trafficking activity.

9. On February 23, 2024, Case Agents met with Confidential Source 1[1] (CS-1) who identified HURTADO as CS-1's source of supply for cocaine. CS-1 stated that HURTADO would sell CS-1 between four to six ounces of cocaine on a weekly basis and would sometimes provide CS-1 cocaine on consignment.

10. Between February 23, 2024, and February 27, 2024, in unrecorded calls CS-1 communicated with HURTADO via Facetime. CS-1 stated HURTADO preferred to communicate with him/her via Facetime to know where CS-1 was located when they spoke to each other. CS-1 agreed to purchase nine ounces of cocaine from HURTADO for $7,200 United States Currency (U.S.C.). CS-1 and HURTADO agreed to meet on February 28, 2024, to conduct the cocaine transaction.

---

[1] CS-1 began working as a confidential human source for the FBI in approximately February 2024. CS-1 has not received any monetary compensation for his/her cooperation with the FBI. CS-1 is cooperating in exchange for consideration on pending state cases. CS-1 is considered reliable and credible, and certain information provided by CS-1 has been corroborated from external sources, including consensually recorded audio and visual recordings, a controlled purchase, and law enforcement databases. CS-1 is a convicted felon and has a criminal history that includes Possess w/intent-cocaine, Recklessly Endangering Safety, Vehicle Operator Flee/Elude, and Resisting or Obstructing a Police Officer.

3

11. On February 28, 2024, CS-1 sent a text message to HURTADO, at the direction of law enforcement, which stated, "Yo." HURTADO, said, "Yo." CS-1 said, "Be ready for you in a minute." CS-1 was reaching out to HURTADO to make sure HURTADO was still available to sell the nine ounces of cocaine to CS-1.

12. On February 28, 2024, at approximately 12:29 p.m., HURTADO called CS-1 to give him directions to the location where they would conduct the cocaine transaction. Specifically, HURTADO said, "Yo," and asked, "Can you meet me on the south?" CS-1 asked, "Where on the south?" HURTADO said, "Okay you, okay you know how you go down Racine Street right, you take a right on the Dekoven, and then you take a left on that first street, it's called Clark Street." CS-1 said, "So…" HURTADO said, "You know, it's like, like, the address is 2011 Clark Street." This communication was both audio and video recorded by law enforcement. According to CS-1, Lucia RODRIGUEZ is HURTADO's girlfriend. The location where HURTADO directed CS-1 to meet him to conduct the cocaine transaction, i.e., 2011 Clark Street, Milwaukee, WI is RODRIGUEZ's listed residence.

13. On February 28, 2024, CS-1 arrived at 2011 Clark Street, Racine, WI, and at approximately 12:49 p.m., the **Pickup** parked behind CS-1. HURTADO was in the front passenger seat of the **Pickup** and a female, believed to be Lucia RODRIGUEZ, was driving. The **Pickup** is registered to RODRIGUEZ. HURTADO got out of the **Pickup** and entered CS-1's vehicle. From video surveillance, law enforcement believed HURTADO had what appeared to be a bag of cocaine in his hand.

14. While in CS-1's vehicle, HURTADO placed a Facetime call to an unidentified male. The unidentified male said, "Yo." HURTADO said, "Make sure you bring a cup." The unidentified male said, "Oh, okay, I got you." HURTADO said, "And bring like another bag too." The unidentified male said, "Okay." HURTADO said, "Alright." Case agents believe that the

4

unidentified male with whom HURTADO spoke was grabbing the nine ounces of cocaine from a stash location. Case agents further believe that HURTADO was instructing the unidentified male to conceal the cocaine in a cup.

15. HURTADO told CS-1, "For this one just give me, just give me fifty…fifty-one, I think it comes to like five-sixty a zip [a "zip" is a street term meaning an ounce of cocaine] or something. Why they trippin my nigga, how much is that?" CS-1 handed HURTADO $7,200 U.S.C. in pre-recorded buy money.

16. While in the car, HURTADO received a telephone call on speakerphone. During the call, HURTADO said, "Que Pasa? I can't hear you." An unidentified male said, "Oh shit my bad." HURTADO said, "Yeah." The unidentified male responded in Spanish. HURTADO asked, "What?" The unidentified male said, "There's a detective over here, this nigga's following me, following her I think." HURTADO told CS-1, "Wait up, go over there, wait up, wait up." The unidentified male said, "Okay." HURTADO said, "What color is the car?" The unidentified male said, "Grey Dodge, it's a grey Dodge pick-up." CS-1 drove around the block with HURTADO. HURTADO said to CS-1, "He said my girl, my girl is at the gas station and there's a detective by her right now." HURTADO gave the CS-1 directions on where to turn. HURTADO said, "You got the (unintelligible) right?" CS-1 said, "Yeah, I got everything." HURTADO and CS-1 drove past the gas station where HURTADO's girlfriend was located. HURTADO called the unidentified male and said, "Yeah, I seen her right there." The unidentified male said, "You seen (unintelligible), you seen it, it's a big Dodge Ram." HURTADO responded in Spanish. The unidentified male said, "Yeah, I'll be right there." HURTADO responded in Spanish. HURTADO asked CS-1, "You just want to meet on the north side?" CS-1 said, "Shit whatever." HURTADO said, "Hey, hey, just come get me." The unidentified male said, "Okay." HURTADO said, "Fuck man, you know the north side, you know where." HURTADO exited CS-1's vehicle.

5

17. At approximately 1:05 p.m., CS-1 called HURTADO and said, "Yo." HURTADO asked, "What's happening?" HURTADO then said, "I'm just, I'm just waiting on my girl to come pick me up real quick. I'm just walking down the street, cause he just said he seen them over there you know what I'm saying, they turned, but still you never fucking know." CS-1 said, "Right, hell no, shit." HURTADO said, "Hell no, give me like five minutes, and I'll call you." CS-1 said, "Alright." HURTADO said, "Okay." At approximately 1:11 p.m., HURTADO telephoned CS-1 via Facetime and CS-1 said, "Yo." HURTADO said, "Wait til three o'clock and I'll meet you over here." CS-1 asked, "You said wait til three?" HURTADO said, "Yeah." CS-1 said, "Alright." HURTADO said, "Okay."

18. Case agents believe through their training and experience, the unidentified male was engaging in countersurveillance and called to warn HURTADO that he spotted suspected law enforcement in the area where RODRIGUEZ and CS-1 were conducting the cocaine transaction. Case agents further believe that this caused HURTADO to leave CS-1's car and temporarily call the deal off for fear that law enforcement would witness the exchange of cocaine and U.S.C.

19. At approximately 7:00 p.m., HURTADO Facetimed CS-1 and instructed CS-1 to meet him at the intersection of Lasalle and Douglas on the north side of Racine to pick up the nine ounces of cocaine. HURTADO instructed CS-1 to get into the passenger seat of HURTADO's **Pickup**. HURTADO retrieved the cocaine from the center console of the truck and handed the cocaine to CS-1.

20. CS-1 met with law enforcement at approximately 8:20 p.m. at a pre-determined location and turned the cocaine over to law enforcement. The narcotics field tested positive for cocaine and fentanyl and had a total package weight of 317.3 grams.

### Pickup spotted at residence affiliated with HURTADO

21. On March 7, 2024, the Honorable Nancy Joseph, United States Magistrate Judge, authorized a search warrant to obtain location data from HURTADO's cell phone for a period of 30 days. Law enforcement was able to use the information obtained from the geolocation warrant to conduct additional surveillance and locate HURTADO's residence(s). Law enforcement conducted a pattern of life analysis based on the geolocation data and found HURTADO primarily stays overnight at address 2626 Maple Grove Avenue, Racine Wisconsin, 53404. At this location, law enforcement has observed the **Pickup** present when the geolocation data indicated HURTADO's cell phone was at that location.

### March 15, 2024, Controlled Narcotics Purchase from HURTADO

22. On March 15, 2024, at approximately 11:41 a.m., CS-1 met with law enforcement to conduct a controlled narcotics purchase from HURTADO. Law enforcement met CS-1 at a predetermined location and equipped CS-1 with audio and video recording equipment. HURTADO attempted to Facetime CS-1 while law enforcement was activating the audio video equipment, but CS-1 did not answer.

23. At approximately 11:42 a.m. CS-1 exited law enforcement's covert vehicle, entered CS-1's vehicle, and placed a Facetime call to HURTADO. When HURTADO did not answer, CS-1 departed the staging area. At approximately 11:43 a.m., HURTADO called CS-1 via Facetime. During the call, HURTADO said, "Hello how long before you get here?" CS-1 said, "Shit, I'll be there in a couple of minutes." HURTADO said, "Okay, I'll be there in five." CS-1 said, "Bet."

24. At approximately 11:51 a.m. HURTADO arrived on Prospect Avenue and parked the **Pickup** in front of the CS-1's vehicle on the south side of the street. CS-1 exited the driver's side of the CS-1's vehicle, walked over to the **Pickup**, and entered the **Pickup's** front passenger

seat. CS-1 said, "What's the word my boy?" HURTADO said, "Chilling and you?" CS-1 said, "Chilling, what's the word." HURTADO said, "Shit just (unintelligible) taking it easy." CS-1 said, "How you doing?" HURTADO said, "Chilling and you?" CS-1 said, "(Unintelligible)." HURTADO laughed. CS-1 said, "Unintelligible." HURTADO said, "Everything, everything, you holler at Reese?" CS-1 said, "Yeah man, he just asked me for your number." HURTADO said, "Yeah, I don't want to give him that number though." CS-1 said, "Why not?" HURTADO said, "I'm saying, you know what I'm saying, calling from jail and shit." CS-1 said, "Yeah." HURTADO asked, "What you think? CS-1 said, "I mean shit, hell naw shit, I mean, you know, shit, he just want some cash, you already know." HURTADO said, "What's up with you?" CS-1 said, "Just chilling man." HURTADO said, "Man I got hash right now man, I don't smoke weed." CS-1 said, "Uh yeah, I'm back on the weed too, you ain't got none?" HURTADO handed the CS-1 suspected crack cocaine. HURTADO said, "That' um, that's a split, but we said at 5, so uh 2,500 at that, what's in here, 3?" CS-1 said, "Yeah, um it's all good." HURTADO said, "Hey um, I have some more tomorrow so you let me know." CS-1 said, "Alright bet." HURTADO asked, "Hey, um, you crashed?" CS-1 said, "Yeah, yeah, he hit my bumper, (unintelligible)." HURTADO said, "You hit somebody?" CS-1 said, "Hell yeah." HURTADO said, "Alright haha I'll holler at you my nigga, be good." CS-1 said, "Love my boy." At approximately 11:53 a.m. CS-1 exited the **Pickup** and entered CS-1's vehicle. CS-1 departed the location for the staging area.

25. At approximately 11:58 a.m., CS-1 arrived at the predetermined staging location and the audio and video equipment was deactivated and the suspected narcotics were handed over to law enforcement. The narcotics field tested positive for cocaine and fentanyl and had a total package weight of 168.5 grams.

### April 6, 2024, Controlled Narcotics Purchase from HURTADO

26. On April 6, 2024, at approximately 4:30 p.m., CS-1 met law enforcement at a pre-determined location to prepare for another controlled narcotics purchase from HURTADO. Law enforcement searched CS-1 for contraband and currency, yielding negative results. They also equipped CS-1 with audio and video-recording equipment. CS-1 subsequently traveled to a residence where he would contact HURTADO to arrange a narcotics transaction. HURTADO had wanted CS-1 to show him CS-1's residence through Facetime. At approximately 4:42 p.m., CS-1 arrived at the residence and entered. Law enforcement was nearby conducting surveillance.

27. At approximately 4:43 p.m., CS-1 sent the following text message HURTADO, "Yo need you, hit me, you gone be around today or no?" HURTADO texted, "I'll be back in bit for sure, like 45 minutes." At approximately 5:41 p.m., HURTADO inquired by text if CS-1 was "Ready." At approximately 5:44 p.m., CS-1 exited the residence and departed the location in CS-1's vehicle. CS-1 informed law enforcement that CS-1 was traveling to Prospect Avenue in Racine, Wisconsin where CS-1 and HURTADO had conducted their previous narcotics transaction.

28. At approximately 5:48 p.m., HURTADO called CS-1 via Facetime. During the call, HURTADO asked, "Where you at?" CS-1 replied, "Shit, I'm 'bout pulling up right now." HURTADO said, "Shit, no fuck, I'm right here, I forgot to tell you, at the car wash on Memorial and what is this Rapids…" CS-1 asked, "Yeah, the car wash on Memorial and Rapids?" CS-1 then asked, "You talking about the little pull in one?" HURTADO replied, "Yeah, right there, I'm right here on the end, cause I'm…I got a bunch of mud in the truck I'm going to take that shit…" CS-1 said, "Alright, alright, here I come." HURTADO responded, "Okay."

29. Law enforcement, who was conducting physical surveillance, drove to National Pride Rapids Drive, Racine, Wisconsin, and observed the **Pickup** parked in the parking lot.

9

30. At approximately 5:52 p.m., CS-1 arrived at the National Pride car wash at 1508 Rapids Drive, Racine, Wisconsin. CS-1 exited CS-1's vehicle and entered the front passenger seat of the **Pickup**, which had previously arrived at the location. HURTADO directed CS-1 to look inside the **Pickup's** center counsel and said, "It should be in there, is it in there?" HURTADO then said, "Oh that's right, it's up here, right," and then reached up to retrieve the suspected cocaine from the sun visor. After CS-1 gave HURTADO $3,500 in pre-recorded funds, HURTADO gave CS-1 a plastic bag containing the suspected cocaine. HURTADO said, "Hit me my nigga." CS-1 responded, "You already know." Following the controlled buy, CS-1 returned to the predetermined staging location and provided law enforcement the suspected narcotics, which field tested positive for cocaine and fentanyl and had a total package weight of 159.7 grams.

### Electronic and Physical Surveillance Conducted by Law Enforcement

31. On March 26, 2024, the Honorable Nancy Joseph, United States Magistrate Judge, authorized a warrant to place a tracking device on the **Pickup** for a period of 45 days. On April 4, 2024, the Honorable Nancy Joseph, United States Magistrate Judge, authorized a search warrant to obtain location data from HURTADO's identified cell phone (i.e., (262) 301-1034) for a period of 30 days. Both electronic tracking and physical surveillance indicated that HURTADO's cell phone and the **Pickup** were still being used in connection with drug-trafficking activity. For instance, on April 17, 2024, at approximately 5:51 p.m., tracking data on the **Pickup** and location data from HURTADO's cell phone indicated they were in the vicinity of Prospect Avenue in Racine, Wisconsin. Investigators subsequently observed, near Prospect Avenue, the **Pickup** parked near a black Chevrolet sedan. An unidentified individual exited the black Chevrolet sedan and entered the passenger side of the **Pickup**. A short time later, the unidentified individual exited the **Pickup** and re-entered the black Chevrolet sedan. Soon thereafter, both the **Pickup** and black Chevrolet sedan left the Prospect Avenue area. Based on training, experience, and knowledge of

10

Case 2:24-mj-00401-SCD    Filed 05/09/24    Page 13 of 15    Document 1

the case, your affiant believes the brief meeting between the unidentified individual and the occupant of the **Pickup**, believed to be HURTADO, was a hand-to-hand narcotics transaction.

32. Case agents are requesting the court authorize the placement of a GPS tracking device on the **Pickup** vehicle. I believe the use of a GPS tracking device on the **Pickup** vehicle will obtain valuable information that could be used as evidence for the possible crimes of distribution and possession with intent to distribute controlled substances, and conspiracy to distribute and possess with the intent to distribute controlled substances, violations of Title 21, United States Code, Sections 841(a)(1) and 846.

## CONCLUSION

33. Based on the foregoing, I request that the Court issue the search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, that authorizes law enforcement, including but not limited to your affiant and technicians assisting in the above-described investigation, to install a tracking device on the **Pickup** within the Eastern District of Wisconsin within 10 days of the issuance of the proposed warrant; to maintain, repair, and/or replace the tracking device as necessary, and to remove the tracking device from the **Pickup** after the use of the tracking device has ended: to install, maintain, and remove the tracking device during both daytime and nighttime hours; to surreptitiously enter the private driveway of 2626 Maple Grove Avenue, Racine, Wisconsin 53404 and/or move the **Pickup** to effect the installation, repair, replacement, and removal of the tracking device; and to monitor the tracking device for a period of 45 days following the issuance of the warrant, including when the tracking device is inside private garages and other locations not open to the public or visual surveillance, both within and outside the Eastern District of Wisconsin.

34. In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the warrant delay notification of the execution of the warrant until

after the end of the authorized period of tracking (including any extensions thereof) for a period of 180 days because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior